1
2
3
4
5
6
7
8

**UNITED STATES DISTRICT COURT**

9

**EASTERN DISTRICT OF CALIFORNIA**

10

11
12

AMERIPRIDE SERVICES, LLC and
ARAMARK UNIFORM & CAREER
APPAREL, LLC,

                Plaintiffs,

13

14

            v.

15

TEAMSTERS LOCAL 87 and TEAMSTERS
LOCAL 386,

16

17

              Defendants.

18

TEAMSTERS LOCAL 87 and TEAMSTERS
LOCAL 386,

19

20

              Petitioners,

21

            v.

22

ARAMARK UNIFORM & CAREER
APPAREL, INC.,

23

24

              Respondent.

         )
         )
         )

Lead Case No.: 1:21-cv-00969 JLT EPG
Member Case No.: 1:21-cv-01102 JLT EPG

**ORDER GRANTING LEAD CASE
DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT; ORDER DENYING LEAD CASE
PLAINTIFFS' MOTION FOR SUMMARY
JUDGMENT**

(Docs. 29, 32)

25
26
27
28

      In this dispute, the Teamsters Locals 87 and 386 assert that Aramark is obligated, according to the provisions of a collective bargaining agreement, to arbitrate their claim that new business locations acquired by Aramark and operated as Aramark facilities, are governed by the collective bargaining agreement.

Before the Court are the parties' cross-motions for summary judgment. (Docs. 29, 32.) For the reasons set forth below, the Teamsters motion for summary judgment (Doc. 29) is **GRANTED** and Aramark/AmeriPride's motion for summary judgment (Doc. 32) is **DENIED**.[1]

# I.      Background

AmeriPride Services, LLC and Aramark Uniform & Career Apparel, LLC operate facilities in California and elsewhere for the purpose of "provid[ing] uniform and linen services, including the rental, sale, and maintenance of uniform apparel, linens and other items." (Doc. 36-1 (Defendants' Response to Plaintiffs' Statement of Undisputed Facts) ("PSUF") #1; Doc. 1 at 4 ¶¶ 8-9; Doc. 32-3 at 2 ¶ 3.) Teamsters Local Union 87 ("Local 87") is the exclusive representative of employees at one such facility, located in Bakersfield, California. (Doc. 50-4 (Joint Statement of Undisputed Facts ("JSUF")) #1.) Teamsters Local Union 386 ("Local 386") is the exclusive representative of employees at another facility, located in Merced, California. (JSUF # 2.) These facilities were owned and/or operated by AmeriPride Services, LLC "[a]t least prior to" January 22, 2018, when Aramark, Inc.[2] acquired

---

[1] For purposes of this order, unless otherwise stated, all citations to docket entries are in reference to the docket in the Lead Case (Case No. 1:21-cv-00969-JLT-EPG). When citing to the docket in the Member Case (Case No. 1:21-cv-01102-JLT-EPG), the Court will so indicate by including "[Member Case]" in the citation.

[2] Multiple companies within the Aramark group structure are identified, most of which share noticeably similar names. In the interests of clarity and consistency, the Court specifies how it will refer to the following entities, which may differ from the names given by the parties:

First, "AmeriPride, Inc." became "AmeriPride, LLC" in 2019. (*See* Doc. 1 at 4 ¶ 7; Doc. 32-2 at 2 ¶ 4.) Because this conversion is immaterial to these proceedings, this plaintiff will be referred to by the Court as simply "AmeriPride."

Second, Lead Case Plaintiffs are subsidiaries of two entities: "Aramark Uniform & Career Apparel Group, Inc." or "Aramark Group," and "Aramark, a Delaware corporation," or "Aramark," both of which appear to be relevant only insofar as Aramark Inc., "through Aramark Group and/or other affiliates," acquired AmeriPride in 2018. (*See* JSUF ## 4, 8; PSUF #1; Doc. 1 at 4 ¶ 7.) Neither entity is a party to this action. Nonetheless, in the event the Court finds it necessary to refer to either entity, "Aramark, a Delaware corporation" will be referred to as "Aramark, Inc." and "Aramark Uniform & Career Apparel Group, Inc." will be referred to as "Aramark Group." As explained below, **any reference to "Aramark" made hereinafter will collectively refer to Lead Case Plaintiffs _only_**.

On this topic, another entity named "Aramark Uniform Service" or "Aramark Uniform Services," is mentioned several times without explanation, including in the parties' collective bargaining agreement (the "Master") and in both grievances. (*See* Doc. 31 at 134, 244, 250-317 (Joint Appendix) ("J.A.")  Exh. 7, 12, 15); *see also* J.A. Exh. 16, 17, 20); Doc. 32-3 at 2 ¶ 2.) It is unclear what relation this entity has to the parties or this action. (*See* Doc. 32-3 at 2 ¶¶ 2-3 [distinguishing between Aramark Uniform Services and Plaintiff, Aramark Uniform & Career Apparel, LLC].) As such, it will not be referred to by the Court.

Third, despite being named in the Master and—presumably for this reason—as a respondent in Teamsters' petition to compel arbitration and grievances, (Doc. 1 [Member Case]; J.A. Exh. 7, 12), "Aramark Uniform &

AmeriPride. (JSUF ## 3-4, 8.) This acquisition "took the form of a merger and change of ownership, including transfers of stock." (JSUF # 14.)

Teamsters Locals 87 and 386 ("Teamsters") are parties to a collective bargaining agreement (the "Master") with Aramark, effective December 30, 2017 through January 28, 2022. (JSUF # 10; J.A. Exh. 15.)[3] Aside from the Master, Locals 87 and 386 are each party to a separate CBA with AmeriPride, which covers the "single-location bargaining unit" of employees at the Bakersfield[4] and Merced facilities, respectively.[5] (JSUF # 7.) These agreements went into effect in late 2016 to mid-2017. (*See* JSUF ## 8-9.) Both AmeriPride CBAs were later extended for "additional rolling 30-day periods" by agreement of the parties and, as of at least July 28, 2023, no party had given notice of a desire to sever either the extension agreement or otherwise terminate either AmeriPride CBA. (*See id.*) The Master has never been applied to the Bakersfield or Merced employees. (*See* PSUF #10.)

_____

Career Apparel, Inc." or "AUCA, Inc." is "a corporate entity that no longer exists." (Doc. 49-1 at 18 n.3.) Instead, "Aramark Uniform & Career Apparel, LLC," a plaintiff in this action, engaged in business as AUCA, Inc. until approximately April 2007, at which point it succeeded AUCA, Inc. (*See id.*; Doc. 1 at 4 ¶ 7; Doc. 32-2 at 2 ¶ 6.) Thus, as party to the Master, the CBA under which the grievances at issue were filed, AUCA, LLC asserts *it* is "the Aramark entity that should be named as a respondent" in Teamsters' petition. (JSUF # 10; Doc. 49-1 at 18 n.3.) Therefore, from this point forward, the Court will refer to AUCA, Inc. and/or AUCA, LLC as "AUCA."

Finally, AmeriPride and AUCA refer to themselves *collectively* as "Plaintiffs," the "Company, "AmeriPride and AUCA," and "AUCA and AmeriPride." (*See* PSUF ## 1-3, 12-13; Doc. 32-1 at 2; Doc. 49-1 at 2.) However, these references are made as to allegations that, as the Court understands the facts, either do not concern one Plaintiff or the other. For instance, their complaint asserts "the *Company* and Local 386 agreed to extend the Merced CBA ..." with citation to the "Merced CBA Extension Agreement." (Doc. 1 at 13 ¶ 52 [citing Doc. 1-6, Exh. F] [emphasis added].) However, the parties' Joint Statement of Undisputed Facts asserts that *AmeriPride* and Local 386 agreed to this extension, citing to the same exhibit. (*See* JSUF # 9 [citing Doc. 1-6, Exh. F].) Indeed, the Merced CBA Extension Agreement was made by and between AmeriPride and Local 386 only. (*See* J.A. Exh. 6.) No reference to AUCA is made. These varying characterizations suggest to the Court that any distinction between "Plaintiffs" and the "Company" are of little importance. Thus, rather than using these terms interchangeably, the Court will refer to AmeriPride and AUCA collectively as "Aramark." The Court finds this is the easiest reference to follow without altering the parties' respective positions.

[3] The full title of the parties' collective bargaining agreement is "AGREEMENT By and Between Aramark Uniform & Career Apparel, Inc. of Bakersfield, Chico, Fresno, Modesto, Redding & Sacramento, California & Reno, Nevada And Teamsters Local Unions: 87, 137, 150, 386, 431 & 533 Affiliated With The International Brotherhood of Teamsters [logo] AUCA CBA #0504 December 30, 2017 - January 28, 2022." (J.A. Exh. 15.) It is referred to by the parties as the "Central Valley CBA," the "AUCA CBA #0504," the "Aramark CBA," and the "Master Agreement." (*See id.* Exh. 7, 12; JSUF ## 10-13; Doc. 50-2 at 5.) As noted in footnote 1, *supra*, the Court will refer to this agreement as the "Master."

[4] The Bakersfield bargaining unit represented by Local 87 also includes certain employees at a service center in Mojave, California. (*See* JSUF # 7 [Doc. 50-4 at 4 n.2].)

[5] The Court will refer to these CBAs, bargaining units, employees, and facilities *collectively* as the "AmeriPride CBAs," the "AmeriPride bargaining units," the "AmeriPride employees," and the "AmeriPride facilities" where appropriate. Otherwise, each will be referred to individually based on location, i.e., Bakersfield or Merced.

### A.     Relevant terms of the Master

#### 1.     The after-acquired clause

Article 1.01 of the Master provides, in part, that:

> The Company recognizes the Union as the bargaining agent for those classifications of employees covered by the Agreement in collective bargaining with the Company and the Local Unions signatory hereto. ***It is further agreed that should any new or additional depots, routes or plants be established by the Company within the jurisdiction of the Locals signatory to this Agreement within Joint Council 7 shall be covered by this Agreement.***

(J.A. Exh. 15, Art. 1.01 [emphasis added].)

#### 2.     The arbitration clause

Article 7 of the Master sets forth the following four-step grievance and arbitration procedure: Step 1 requires the parties to first discuss "[a]ny issue concerning the proper application and interpretation of this Agreement" with the General Manager and Union Steward. (J.A. Exh. 15, Art. 7.01.) If no resolution is reached, the parties proceed to Step 2, which provides that "*[a]ll matters pertaining to the proper application and interpretation of any and all of the provisions of this Agreement* shall be adjusted by the accredited representative of the Company and the accredited representative of the Union." (*Id.*, Art. 7.02 [emphasis added].) If the parties "fail to reach a satisfactory adjustment," they must proceed to Step 3, which states that the matter shall be referred for final adjustment to the Northern California Board of Adjustment wherein a majority decision shall be final and binding." (*Id.*)

Finally, if the Board of Adjustment is "unable to adjudicate a case … due to a 'deadlock,'" the parties reach Step 4, which permits either party to "request to move the case to an arbitrator for adjudication." (*Id.*, Art. 7.03.) This request must be by "written notice and confirmed receipt to the other party." (*Id.*) As part of this final step, the parties must select from a list of eleven qualified arbitrators submitted by the Federal Mediation & Conciliation Service. (*Id.*) The selected arbitrator *"may interpret the Agreement and apply it to the particular case presented, but shall not have authority to add to, subtract from, or in any way modify the terms of this Agreement or any agreements made supplementary hereto."* (*Id.*, Art. 7.04 [emphasis added].) The arbitrator's decision

will be final and binding "provided the arbitrator abides by the authority limitations set forth above." (*Id.*)

**B.      The grievances**

On August 15, 2019, Local 87 filed a grievance on behalf of the former AmeriPride employees at the Bakersfield facility, asserting that Aramark violated Article 1 of the Master by failing to recognize employee drivers[6] working at that facility. (J.A. Exh. 12; JSUF #11.) Accordingly, it requests that the drivers be recognized as "Teamsters Local 87 drivers" under the Master and that Aramark "cease and desist, and follow Article 1.01" of the Master. (*Id.*)

Local 386 followed suit, filing its grievance with respect to the Merced employees on January 2, 2020. (JSUF # 12.) The grievance was filed "under Article 1 and all other articles or sections that may apply of the [Master]." (J.A. Exh. 7.) It alleges that the former AmeriPride facility in Merced must be covered under the Master and thus, that all employees at that facility "are entitled to pay rates and all other benefits" listed in the Master. (*Id.*) Aramark denied both grievances. (JSUF ## 11-12.)

**C.      Request for arbitration and the present actions**

By letter dated October 27, 2020, Teamsters proceeded to request arbitration under Article 7.03 of the Master. (JSUF # 13.) By letter dated November 13, 2020, Aramark informed Teamsters that their requests "would not be processed." (JSUF # 14.) The same day,[7] Aramark filed a National Labor Relations Board charge against Teamsters, alleging that the grievances violated the National Labor Relations Act by "restraining and coercing employees in the exercise of rights guaranteed in NLRA Section 7 … and by violating [Teamsters'] duty to bargain collectively …." (JSUF # 15.) Aramark

---

[6] The Master specifies that for its purposes, the term "employees" means:

> "Route Representatives" engaged in the pickup and/or delivery, or the selling or soliciting of laundry dry cleaning and allied services. It shall cover all truck drivers, driver helpers, inter-plant or relay drivers and such other personnel as may perform any work described in the classifications or applicable definitions herein only. Excluding therefrom, however, all "District Manager, Sales and Service Representatives, Maintenance employees, Office and Clerical employees, Plant Supervisors, Executives, Managers, Supervisors, Professional and Administrative employees and guards in accordance with the Act."

(J.A. Exh. 15, Art. 1.01.)

[7] The Joint Statement of Undisputed Facts erroneously indicates that the charge was filed on November 13, 2021. (*Compare* J.A. Exh. 21; Doc. 1 at 10 ¶ 26; Doc. 1 [Member Case] at 5 ¶ 22.)

1  ultimately withdrew the charge and filed this declaratory judgment action under section 301 of the

2  Labor Management Relations Act, 29 U.S.C. § 185, seeking a declaratory judgment that no substantive

3  arbitrability obligation exists with respect to Teamsters' grievances. (*See generally* Doc. 1; JSUF #22.)

4  Teamsters then filed a petition to compel arbitration, also under section 301, based on Aramark's

5  refusal to arbitrate.[8] (*See generally* Doc. 1 [Member Case].) The cases were deemed related, (Doc. 9

6  [Member Case]), and the parties eventually stipulated to consolidate the two actions, mutually waive

7  discovery, and "have relevant issues decided based on cross-motions [for summary judgment]." (Doc.

8  24 at 4.) The Court granted the stipulation and cross-motions for summary judgment were filed on

9  December 9, 2021. (Docs. 25, 29, 32.)

10  **II.    Legal Standards**

11        Section 301 of the Labor Management Relations Act provides that "[s]uits for violation of

12  contracts between an employer and a labor organization … may be brought in any district court of the

13  United States. 29 U.S.C. § 185(a). This includes actions "for specific enforcement of an agreement to

14  arbitrate," *Installit, Inc. v. Carpenters 46 N. California Ctys. Conf. Bd.*, 214 F. Supp. 3d 855, 859 (N.D.

15  Cal. 2016), as well as actions for declaratory relief. *See Huettig & Schromm, Inc. v. Landscape*

16  *Contractors Council of N. California*, 790 F.2d 1421, 1425 (9th Cir. 1986) ("[d]eclaratory relief under

17  the Declaratory Judgment Act … is generally available in actions brought under section 301").

18        The Supreme Court has determined that "arbitration is a matter of contract and a party cannot be

19  required to submit to arbitration any dispute which he has not agreed so to submit." *United*

20  *Steelworkers of America v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 582 (1960). Thus, "[u]nless the

21  parties clearly and unmistakably provide otherwise," *AT & T Techs., Inc. v. Commc'ns Workers of Am.*,

22  475 U.S. 643, 649 (1986), "the question of arbitrability—whether a collective-bargaining agreement

23

24  ───────────────

[8] Teamsters Local Unions 137 and 431 were initially named as defendants in the Lead Case and as petitioners in
25  the Member Case. By stipulation of the parties, all claims brought by and against Locals 137 and 431 in both
cases were dismissed with prejudice. (Docs. 44, 45.) Because the pending cross-motions were filed prior to
26  dismissal, the parties were directed to file red-lined versions of their respective briefs. (*See* Docs. 46-50.) Thus,
with the exception of docket entry numbers 1 (in both cases), 31, 32-2, 32-3, 36-1, and 38, of which red-lined
27  versions were not submitted, **the Court will refer to the updated briefs in its discussion**, as they were
amended only to the extent reference to the dismissed parties was made and such amendment did not alter the
relevant facts or the parties' stated positions as they relate to Locals 87 and/or 386. The Court will omit all
references to the dismissed parties when citing non red-lined documents or any other relevant docket entries
28  predating the partial dismissal.

1   creates a duty for the parties to arbitrate the particular grievance—is undeniably an issue for judicial

2   determination" rather than one to be arbitrated, *id.*; *see also Granite Rock Co. v. Int'l Bhd. of*

3   *Teamsters*, 561 U.S. 287, 301 (2010) ("[I]t is the court's duty to interpret the agreement and to

4   determine whether the parties intended to arbitrate grievances concerning a particular matter.") (internal

5   quotation marks omitted).[9]

6          On the other hand, "congressional policy [is] in favor of settlement of disputes by the parties

7   through the machinery of arbitration." *Warrior & Gulf*, 363 U.S. at 582. Thus, there is a presumption of

8   arbitrability in labor disputes involving contracts that contain arbitration clauses, meaning that "an

9   order to arbitrate the particular grievance should not be denied unless it may be said with positive

10  assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted

11  dispute. Doubts should be resolved in favor of coverage." *AT & T*, 475 U.S. at 650 (quoting *Warrior &*

12  *Gulf*, 363 U.S. at 582-83). This presumption applies to agreements containing broad arbitration clauses,

13  where "in the absence of any express provision excluding a particular grievance from arbitration, we

14  think only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail."

15  *Id.* (quoting *Warrior & Gulf*, 363 U.S. at 584-85); *see also Dennis L. Christensen Gen. Bldg.*

16  *Contractor, Inc. v. Gen. Bldg. Contractor, Inc.*, 952 F.2d 1073, 1077 (9th Cir. 1991), *as amended on*

17  *denial of reh'g* (Dec. 18, 1991) (explaining the presumption of arbitrability "is particularly potent if the

18  arbitration clause is broad").

19         "[I]n deciding whether the parties have agreed to submit a particular grievance to arbitration, a

20  court is not to rule on the potential merits of the underlying claims." *AT & T*, 475 U.S. at 649; *see also*

21  *Warrior & Gulf*, 363 U.S. at 582 ("[T]he judicial inquiry under [section] 301 must be strictly confined

22  to the question whether the reluctant party did agree to arbitrate the grievance[.]"); *United Steelworkers*

23  *of America v. American Mfg. Co.*, 363 U.S. 564, 568 (1960) ("The agreement is to submit all

24

25  ────────────────

26  [9] The Supreme Court in *Granite Rock* also settled any outstanding uncertainties regarding whether the
    arbitrability framework in section 301 cases differs from that applied in commercial disputes under the Federal
    Arbitration Act. *See SEIU Loc. 121RN v. Los Robles Reg'l Med. Ctr.*, 976 F.3d 849, 854 (9th Cir. 2020)

27  ("[*Granite Rock*] emphasized—repeatedly—that the analysis for determining whether a dispute is arbitrable in
    the labor context is the exact same analysis applied in the commercial context."); *United Paperworkers Int'l*

28  *Union, AFL-CIO v. Misco, Inc.*, 484 U.S. 29, 41 n.9 (1987) ("federal courts have often looked to the [FAA] for
    guidance in labor arbitration cases, especially in the wake of the holding that § 301 … empowers the federal
    courts to fashion rules of federal common law …").

1  grievances to arbitration, not merely those which the court will deem meritorious.").

2  **III.    Discussion and Analysis**

3      **A.    Substantive Arbitrability**

4          There are three types of disputes that arise in cases involving the issue of arbitrability, which

5  the Ninth Circuit illustrated well:

6          (1) the "Merits Question"—a dispute between the parties regarding the
           merits of an issue …; (2) the "Arbitrability Question"—a dispute
7          regarding whether the parties agreed to arbitrate the Merits Question …;
           and (3) the "Delegation Question"—a dispute regarding whether an
8          arbitrator or a court is tasked with deciding the Arbitrability Question.

9  *SEIU Loc. 121RN v. Los Robles Reg'l Med. Ctr.*, 976 F.3d 849, 852 and n.2 (9th Cir. 2020) (citing

10  *ASARCO LLC v. United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv.*

11  *Workers Int'l Union, AFL-CIO, CLC*, 910 F.3d 485, 496-97 (9th Cir. 2018) (Ikuta, J., dissenting)).

12          The parties agree[10] that the dispute *here* is one of substantive arbitrability (the Arbitrability

13  Question)[11] and that the Court is tasked with deciding this question (the Delegation Question), while

14  resolution of the grievances' merits (the Merits Question) is reserved for arbitration. (*See* Doc. 49-1 at

15  18-19, 22; Doc. 49-2 at 7-8; Doc. 50-2 at 11.) [12] They also agree that the merits-related dispute

16

---

17  [10] Aramark does not challenge that the Master, including its arbitration clause, is a valid and binding agreement
18  to which it is a party. (*See* JSUF # 10; *see also* J.A. Exh. 15; Doc. 49-1 at 12 [acknowledging the Master's
    arbitration clause, that it is final and binding, and that it gives the arbitrator certain authorities]; *id.* [noting that
19  the Master "sets forth wages (Art. 16, 17), hours (Art. 4), benefits (Arts. 10, 15, 20), and other terms and
    conditions of employment for bargaining unit employees at [Aramark] facilities covered by the [Master]"]; Doc.
    1 at 9 ¶ 30.) Thus, Aramark's assertions that it "did not agree" or "consent" to arbitrate certain issues raise a
20  challenge to the arbitrability of the grievances, or as discussed *infra*, a challenge to the grievances' merits,
    rather than to the existence of an agreement altogether. (*See* Doc. 49-1 at 8, 26; Doc. 49-2 at 10.)

21  [11] As Aramark notes, both parties' claims "turn on the issue of whether [Teamsters'] grievances are arbitrable,"
22  which "involves a question of substantive arbitrability—'whether a collective-bargaining agreement creates a
    duty for the parties to arbitrate the particular grievance'—which must be decided by the courts." (Doc. 49-1 at
23  18, [quoting *AT & T*, 475 U.S. at 649] [emphasis omitted]; *see also id.* at 19 [arguing the grievances are not
    substantively arbitrable]; Doc. 49-2 at 8 ["the dispute here involves a question of substantive arbitrability"];
24  Doc. 49-3 at 7 [asserting that the Court should resolve the question of substantive arbitrability "at issue here"];
    Doc. 50-2 at 4, 8-11 [arbitrability as basis of Teamsters' motion].)

25  [12] Aramark contends that Teamsters disputes that the Court is to decide the arbitrability of the grievances, but
26  points to no argument demonstrating this. Teamsters indicates otherwise. (*See, e.g.*, Doc. 50-2 at 9 ["[T]he
    question of arbitrability is decided by the Court."]; Doc. 50-5 at 7 ["The only question for the Court is, did the
    parties agree to arbitrate disputes regarding the [Master]."].) Given Teamsters' clear indications to the contrary,
27  Aramark's contentions suggest a misunderstanding of substantive arbitrability. (*See* Doc. 49-2 at 10
    ["[C]ontrary to [Teamsters'] assertions, the question of substantive arbitrability in this case unquestionably
    presents an issue *for this Court* to decide, rather than an arbitrator."] [emphasis in original]; *see also* Doc. 49-3
28  at 6 ["black-letter law defeats [Teamsters'] contention that any question regarding arbitrability must be
    submitted to the arbitrator"].)

concerns the application of the Master to the former AmeriPride employees by way of Article 1.[13]

Aramark acknowledges that the Master's arbitration clause grants the arbitrator the authority to interpret and apply the terms of the Master (Doc. 49-1 at 12) and concedes that determining whether Article 1 applies to the AmeriPride employees requires interpretation of a provision of the Master. (*See* Doc. 49-2 at 7 ["Nor does resolving the parties' dispute regarding substantive arbitrability turn on the interpretation of Article 1.01 of the [Master] (which states the agreement applies to 'new or additional depots, routes or plants … established by the Company within [Teamsters'] jurisdiction').") [quoting J.A. Exh. 15 at 248].) Aramark goes astray when it conflates its own challenges to arbitrability with the merits of the dispute.

### 1.   The proper inquiry

In determining "whether a collective bargaining agreement creates a duty for the parties to arbitrate the particular grievance," *AT & T*, 475 U.S. at 649, the Court must ask "whether a particular merits-related dispute is arbitrable because it is within the scope of a valid arbitration agreement." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944-45 (1995) (emphasis omitted); *see also Mirage*, 911 F.3d at 596 ("[T]he substantive arbitrability inquiry … examines the parties' arbitration agreement and determines whether a particular dispute is within its scope, and thus 'arbitrable,' or outside its scope, and thus 'non-arbitrable.'").

Although Aramark accurately defines substantive arbitrability, (*see* Doc. 49-1 at 18, 21; Doc.

---

[13] For example, Aramark asserts that the grievances "seek to have an arbitrator impose [the Master] on the Merced and Bakersfield facilities," (Doc. 49-3 at 7, emphasis omitted); the grievances "seek to apply the [Master] to bargaining units at facilities where separate and distinct CBAs already exist," (Doc. 49-1 at 21); and the merits of the grievances involve whether the [AmeriPride] facilities are "new or additional depots, routes, or plants" under Article 1.01 of the Master. (*id.* at 22.; *see also id.* at 15 [specifying that Local 87 "filed a grievance pursuant to the [Master] claiming [Aramark] is required under Article 1 of the [Master] to apply the [Master] to employees at the Bakersfield facility …] *id.* at 16 [noting similar grievance filed by Local 386]; *id.* at 22 and n.6 [specifying that *the merits of the grievances involve whether the [AmeriPride] facilities are* "new or additional depots" *under Article 1.01 of the Master* and clarifying its position that Teamsters' interpretation of the Master "lacks merit and provides no legitimate basis for making the [Master] applicable to the [AmeriPride] facilities"] [emphasis added].)

Likewise, Teamsters indicate they filed their grievances "under the [Master] asserting that pursuant to Article 1.01 Aramark must apply the terms of the [Master] to the [AmeriPride] employees …." (Doc. 50-2 at 6; *see also id.* [detailing Local 87 grievance]; *id.* at 7 [detailing Local 386 grievance]; *id.* at 9 [specifying that the grievances concern the application of Article 1.01 to the AmeriPride employees]; *id.* at 10 [asserting that the grievances raise the issue whether Aramark's acquisition and operation of former AmeriPride facilities constitutes establishment of "new or additional depots, routes or plants" under Article 1.01 of the Master and, therefore, whether terms of Master must be applied to AmeriPride employees].)

1    49-3 at 7, quoting *AT &T*), it seeks to reframe the scope of the Court's inquiries. Aramark argues that

2    "[t]he threshold question of arbitrability must reflect the existence of the [AmeriPride CBAs]," (Doc.

3    49-3 at 8, emphasis omitted); that the Court's substantive arbitrability inquiry "warrants a finding that

4    the grievances … are governed by the [AmeriPride CBAs], which precludes the existence of a duty-to-

5    arbitrate pursuant to the [Master]," (Doc. 49-2 at 8); that the question to be resolved before compelling

6    arbitration is "whether the claims being asserted are encompassed by the arbitration agreement(s) that

7    actually exist between the parties," (*id*. at 7);[14] that the "relevant question" is "whether the parties

8    agreed to arbitrate the issue of Article 1 of the [Master's] application to the [AmeriPride] bargaining

9    units in light of the separate and distinct [AmeriPride] CBAs and arbitration provisions specifically,"

10   (Doc. 49-1 at 21); and that the parties' dispute involves whether Aramark "can be compelled – under

11   the [Master] – to arbitrate grievances involving the Merced and Bakersfield facilities, even though

12   each of these facilities … has been covered by a separate single-location CBA containing its own final

13   and binding grievance arbitration procedure." (Doc. 49-2 at 8-9 [emphases omitted].)[15]

14           In defining the inquiry in this manner, Aramark argues that the Court should reject Teamsters'

15   "conclusory assertion" that the *grievances* are arbitrable merely because they *refer* to Article 1.01[16]

16

17   _____

18   [14] It is unclear whether Aramark intends the "arbitration agreement(s) that actually exist" to implicate the
     AmeriPride CBAs, the Master, or both. Considering Aramark's position that the AmeriPride CBAs—not the

19   Master—cover the AmeriPride employees, the Court concludes this is made in reference to the AmeriPride
     CBAs. Insofar as Aramark is suggesting that the Court should examine whether the grievances fall within the

20   scope of the *Master*, this is the proper inquiry, although Aramark's analysis is not in accord with such a
     suggestion.

21   [15] Aramark makes no effort to reconcile these inconsistencies or explain how its proposed inquiries fit into the
     framework for determining arbitrability under established precedent. It is not the Court's duty to parse through

22   conflicting and unorganized assertions on Aramark's behalf, especially given the extraordinary lack of
     resources and impacted caseload in this district. *See Indep. Towers of Washington v. Washington*, 350 F.3d 925,

23   929 (9th Cir. 2003) ("[J]udges are not like pigs, hunting for truffles buried in briefs.") (quoting *United States v.
     Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991)).

24   [16] Aramark fails to direct the Court to such an assertion. Instead, Teamsters specify that the grievances must be
     submitted to arbitration because they concern "the application of Article 1.01 of the [Master] to the

25   [AmeriPride] employees …," which "constitutes a matter pertaining to the proper application and interpretation
     of the [Master]." (*See* Doc. 50-2 at 9; *see also id*. at 10 [asserting its grievances raise the issue of whether the

26   former AmeriPride facilities are "new or additional depots" under Article 1.01 "and therefore whether the terms
     of the [Master] must be applied to the relevant employees. This issue is clearly one encompassed within the
     broad scope of the [Master's] grievance-arbitration provision."]; *id*. at 10-11 ["The interpretation of Article 1.01

27   of the [Master] and its application to relevant employees is clearly a dispute arising out of the [Master] and
     therefore, the presumption of arbitrability must prevail."]; Doc. 50-6 at 2 [arguing the grievances "raise a clear

28   question regarding the interpretation and application" of the after-acquired clause, as they were "filed after
     Aramark acquired AmeriPride and arguably 'established' the [AmeriPride facilities] as Aramark facilities"].)

and accept Aramark's recharacterization: that the *overall dispute* involves whether Aramark can be compelled to arbitrate grievances involving the separate facilities even though the facilities are covered by separate CBAs. (*See* Doc. 49-2 at 8-9.) Aramark cites *Southern California District Council of Laborers v. Berry Construction, Inc.*, 984 F.2d 340 (9th Cir. 1993), to support its position. (*Id*. at 8.) In *Berry*, the parties were bound to a collective bargaining agreement containing a broad arbitration clause that required "all grievances or disputes arising between [the parties] over the interpretation or application of the terms of this Agreement [to] be settled by the procedures set forth in Article VI." 984 F.2d at 341. Article VI provided a three-step dispute resolution process culminating in arbitration. *Id*. at n.1. However, "jurisdictional disputes" were specifically excluded from this "normal grievance process" and were instead subject to a separate resolution procedure under Article IV(F), which did not involve arbitration. *Id*. at 342 and n.3.

The parties in *Berry* disagreed whether the *underlying* dispute—an alleged violation of the agreement's subcontracting clause—was jurisdictional and, thus, non-arbitrable, or whether it was contractual and subject to arbitration. *See Berry*, 984 F.2d at 343. In such circumstances, the Ninth Circuit explained that "[t]he proper inquiry … is not whether the underlying dispute is arbitrable in and of itself; rather, we must ask whether the overall dispute, *which encompasses the disagreement over the nature of the underlying dispute,* is arbitrable under the terms of the CBA." *Id*. (emphasis in original). Thus, the Court was tasked with determining whether the parties agreed to arbitrate disputes over the alleged violation of a substantive provision *and* whether they agreed to arbitrate disagreements as to the nature of that dispute—that is, whether they agreed to arbitrate disputes over which substantive provision governed the underlying dispute. the Article VI (arbitration) or Article IV(F) (no arbitration) procedures applied.

Notwithstanding the fact that even Aramark's proffered definitions of the disputes don't align with the rationale in *Berry*, Aramark does not articulate why the Court should "reject" Teamsters' assertion that the grievances are arbitrable because they refer to Article 1 of the Master, when Aramark concedes that the underlying dispute is the Master's application—by way of Article 1.01[17]—

---

[17] Aramark does not challenge that if the Master applied to the AmeriPride employees, it would be by way of Article 1.01. (*See* Doc. 49-1 at 21 [asserting "the relevant question is … whether the parties agreed to arbitrate

1   to the AmeriPride employees (*see* Doc. 49-1 at 22), and *Berry* makes clear that the Court's inquiry

2   does not ignore the arbitrability of the underlying dispute. Moreover, contrary to the facts in *Berry* as

3   well as Aramark's assertions, the parties do *not* disagree as to the nature of the underlying dispute.

4   (*See* Doc. 49-2 at 8.) Therefore, Aramark's argument appears to be that *Berry*'s holding somehow

5   expands the Court's arbitrability inquiry to include *any* challenge to arbitrability a party wishes to

6   raise. However, *Berry* did not stand for the proposition that an argument raised by a party, or its own

7   characterization of the "dispute," automatically defines the dispute to be *arbitrated*. To hold otherwise

8   would render the parties' agreement to arbitrate meaningless, as any party seeking to avoid arbitration

9   could unilaterally fashion a "dispute" challenging arbitrability that is outside the scope of the parties'

10   arbitration agreement.[18]

11           Furthermore, if the Court were to accept Aramark's inquiry as proper, any "new or additional

12   depots …" established by Aramark by way of an acquisition would expose the former company's

13   employees to the same challenge facing the former AmeriPride employees here. That is, Aramark

14   could raise the argument that any CBAs covering the employees prior to the acquisition automatically

15   preclude a duty to arbitrate under the Master simply because the CBAs exist (or alternatively, as

16   discussed *infra*, that the mere existence of a separate CBA is always "forceful evidence" of an intent to

17   exclude claims involving those employees from arbitration).

18           Finally, Aramark's characterizations of the inquiry and dispute would have the Court decide

19   whether Aramark has a duty to arbitrate, but not on the basis that it did not form an agreement with

20   Teamsters, that the Master's arbitration clause is invalid, or that the particular grievances are not

21   within the scope of the clause.[19] Instead, in essence, Aramark is asking the Court to rule on the merits,

22

23   *the issue of Article 1 of the [Master's] application to the [AmeriPride] bargaining units* in light of" the
    AmeriPride CBAs] [emphasis added]; *see also* Doc. 49-2 at 7 [noting that the grievances claim Aramark "is

24   required to apply the terms of the [Master] to employees at the [AmeriPride] facilities under Article 1.01 of the
    [Master]"].)

25   [18] Even if the Court were to follow the rationale in *Berry* and accept Aramark's characterizations, the Court's
    inquiry would be(1) whether the parties agreed to arbitrate disputes involving the application of Article 1.01 to

26   the former AmeriPride facilities *and* (2) whether they agreed to arbitrate issues regarding "Article 1.01's
    application to the separate facilities in light of the separate and distinct Merced and Bakersfield CBAs and

27   arbitration provisions specifically." (Doc. 49-1 at 21.) This would not change the outcome; both disputes
    involve the interpretation and application of the terms of the Master and thus, fall within the scope of the

28   Master's arbitration clause.

    [19] Aramark raises what at first glance appear to be "scope" challenges but, as discussed *infra*, they are

1   which it may not do. *See AT & T*, 475 U.S. at 649.[20]

2          To illustrate, Aramark seeks to have the Court determine that there is no duty to arbitrate the

3   issue of Article 1.01's application to the former AmeriPride employees by evaluating the AmeriPride

4   CBAs as opposed to examining the subject matter of the grievances and the breadth of the Master's

5   arbitration clause. According to Aramark's argument, the Court must not only recognize the existence

6   of the AmeriPride CBAs, (*see* Doc. 49-3 at 8), it must evaluate their impact and effect on the Master's

7   application, (*see* Doc. 49-1 at 22), and ultimately find that the AmeriPride CBAs apply to the

8   employees, rather than the Master. This is indistinguishable from a request that the Court decide

9   whether the Master applies to the AmeriPride employees. (*See, e.g.*, *id.* at 19 [asserting the former

10  AmeriPride employees are "covered by their own separate and distinct CBAs and not the [Master]";

11  *id.* at 24 [arguing the employees are not covered by the Master]; Doc. 49-3 at 11 [contending the

12  "plainly expressed intent" of the AmeriPride CBAs' provisions "warrants a conclusion" that the

13  AmeriPride CBAs "and *not* any other contract or agreement, most pointedly, the [Master]" have

14  applied to the former AmeriPride facilities] [emphasis in original]; Doc. 49-1 at 11 [noting that the

15  AmeriPride CBAs "constitute the entire agreement" and provide for "final and binding" arbitration];

16  *id.* at 28 [asserting the AmeriPride CBAs "currently in effect … govern the wages, hours, benefits, and

17  other employment terms and conditions" concerning the employees; *id.* at 30 [arguing the AmeriPride

18  CBAs "govern[] all grievance arbitration obligations"].)

19

20

---

21  unsupported by meaningful argument or legal authority and rely on improper legal standards. They appear
    instead to be raised to divert attention from the impropriety of Aramark's proposed inquiry, the lack of a
22  dispute, or both.

23  [20] Separately, Aramark asserts that "the dispute here is not arbitrable because it does not involve the merits of
    [Teamsters'] grievances." (Doc. 49-1 at 22; *see also* Doc. 49-2 at 7 [asserting that resolving the substantive
24  arbitrability dispute does not "turn on the interpretation of Article 1.01" of the Master]; Doc. 49-3 at 6 [claiming
    its "arguments against arbitrability … do not rest on any disputed interpretation involving the [Master]"].) To be
25  clear, the *dispute here*—whether the grievances are substantively arbitrable—*must not* involve the merits. The
    fact that the dispute before the Court does not involve the merits is precisely why the Court may properly
26  resolve it. And, as already discussed, this fact is not in dispute. In addition, the dispute *here* is simply not the
    relevant dispute to examine when determining *arbitrability*. That is to say, the issue is not whether the parties
27  agreed to *arbitrate* the issue of substantive arbitrability. This would raise a question of delegation, which is not
    in dispute. *See Los Robles*, 976 F.3d at 852 (defining the "Delegation Question" as "a dispute regarding whether
    an arbitrator or a court is tasked with deciding the Arbitrability Question"); *see also Loc. Joint Exec. Bd. v.*
28  *Mirage Casino-Hotel, Inc.*, 911 F.3d 588, 597 (9th Cir. 2018) ("[A] disagreement over *who should decide the*
    *merits* of a dispute is distinct from a disagreement over *who should decide who decides* the merits.") (citing
    *First Options*, 514 U.S. at 942) (emphasis in original).

13

1      Separately, Aramark argues preemptively that Aramark's acquisition of AmeriPride or any

2 subsequent branding-related changes "somehow impacted and/or rendered obsolete" AmeriPride's

3 corporate structure, the AmeriPride bargaining units, the AmeriPride CBAs, or the parties' existing

4 obligations. (*See* Doc. 49-1 at 29-31; Doc. 49-2 at 11-13; Doc. 49-3 at 13; Doc. 50-2 at 6.) However,

5 this issue also goes to the merits of Teamsters' claims. As Teamsters note, "[t]here is … an apparent

6 dispute between the parties as to what event or events arguably triggered the potential application of

7 the After-Acquired Clause to the former AmeriPride facilities, a dispute that, if necessary, is for

8 resolution by an arbitrator." (Doc. 50-5 at 12.) The Court agrees.[21]

9      Any potential effect of the acquisition or rebranding on the applicability of Article 1.01 to the

10 former AmeriPride facilities—or any other alleged event or conduct (e.g., contract extensions,

11 continued recognition of the AmeriPride CBAs, etc.) that would implicate Article 1.01, would require

12 interpretation and/or application of a provision of the Master. Likewise, Aramark's assertion that

13 Article 1.01 does not constitute an agreement to merge bargaining units fares no better, as this also

14 implicates application and/or interpretation of the Master. (*See* Doc. 49-3 at 12.) These arguments are

15 therefore rejected.

16      In sum, Aramark seeks a determination whether the Master applies to the former AmeriPride

17 employees.[22] The grievances seek arbitration to resolve whether the AmeriPride locations are subject

18 to the Master CBA. Thus, Aramark expressly addresses the merits of the dispute and not whether the

19 dispute is subject to arbitration. Consequently, Aramark's view of the inquiry is improper and its

20 attempts to mask its merits challenge as an arbitrability dispute are unavailing. Furthermore, it is

21

22 _____

[21] To illustrate this dispute, Teamsters clarifies that though Aramark suggests it was the acquisition that caused
23 Teamsters to file the grievances, they actually "raise the *branding changes* as evidence that [Aramark]
established the former AmeriPride facilities as Aramark facilities, activating the After-Acquired Clause of the
[Master]," and ultimately leading to the grievances being filed. (Doc. 50-6 at 9 [emphasis added]; *see also* Doc.
24 50-5 at 12.) Teamsters also specifies that it is the after-acquired clause that alters the parties' labor obligations,
not the branding changes or, as Aramark contends, the acquisition. (*See id.*)

25 [22] Though Aramark largely refrains from asserting that the Master does not apply to the AmeriPride employees,
this is a distinction without a difference. The Court is satisfied that the heart of Aramark's "arbitrability"
26 challenge is effectively its merits challenge—whether the Master applies to the AmeriPride employees. *See*
*Mirage*, 911 F.3d at 598 ("The cornerstone of Mirage's 'arbitrability' challenge was that Mirage had no
27 employment relationship with the aggrieved employees—the very crux of its merits challenge.") In other words,
even if the Court were to accept Aramark's assertion—that the dispute concerns the impact and effect of the
28 AmeriPride CBAs—this does not bear on Aramark's duty to arbitrate, as Aramark concedes that the grievances
themselves are substantively arbitrable.

apparent that Aramark improperly defines the relevant dispute, mischaracterizes the Court's inquiry, and as a result, avoids addressing the relevant question: is the "particular merits-related dispute … arbitrable because it is within the scope of a valid arbitration agreement?" *First Options*, 514 U.S. at 944-45.

2.     The dispute is within the scope of the Master's arbitration clause

Under Article 7 of the Master, the parties agreed to a grievance procedure that includes "final and binding" arbitration of "[a]ll matters pertaining to the proper application and interpretation of any and all of the provisions" of the Master. (J.A. Exh. 15, Art. 7.02, 7.04.) These broad terms are entitled to the presumption of arbitrability. *Warrior & Gulf*, 363 U.S. at 585; *Christensen*, 952 F.2d at 1077 (recognizing "potent" presumption where arbitration clause is broad and noting plaintiff's concession that clause submitting to arbitration "all disputes concerning the interpretation or application of [the parties' agreements]" is "very broad"). Where, as here, the arbitration agreement does not contain an "express provision excluding a particular grievance from arbitration," the issue is "a simple one: is there forceful evidence of a purpose to exclude these grievances from arbitration so that the heavy presumption in favor of arbitration is overcome?" *Howmet*, 466 F.2d at 1252 (quoting *Warrior & Gulf*, 363 U.S. at 585). Like the Ninth Circuit in *Howmet*, the Court holds there is not.

Aramark argues that even in the absence of an express provision, the AmeriPride CBAs "constitute 'forceful evidence' of the parties' intent to exclude such claims from arbitration under the [Master]." (Doc. 49-1 at 22, citing *Warrior & Gulf*, 363 U.S. at 584-85; *AT & T*, 475 U.S. at 650; *see also* Doc. 49-2 at 10.) Aramark asserts its position is "supported by Ninth Circuit cases refusing to compel arbitration of grievances that seek to apply the terms of a CBA to employees at a facility that is already governed by a separate CBA." (*See* Doc. 49-2 at 10-11.) These cases are distinguishable.

In *Howmet*, the Court held that where an employer had agreements with *different unions*, arbitration should not be compelled, because an award in favor of the union would "foster rather than alleviate industrial disharmony by forcing the employer to arbitrate with one union issues which touched the very heart of the employer's collective bargaining agreement with another union." 466 F.2d at 1254; *see also Stove, Furnace & Allied Appliance Workers Int'l Union of N. Am., AFL-CIO, Loc. 123-B v. Gaffers & Sattler, Inc.*, 470 F.2d 860 (9th Cir. 1972) (following *Howmet* based on an

15

1   "identical issue" and "remarkably similar" facts). The Court agrees with Teamsters that these cases do

2   not support Aramark's position, nor does Aramark offer an explanation otherwise. (*See* Doc. 50-6 at 4-

3   5 ["[T]he key factor in the court's decision [in *Howmet*] was the conflict the grievance raised between

4   the obligations the employer owed to *different unions*. Here, there is no such conflict. The same

5   Teamsters Locals that are parties to the individual agreements covering the former AmeriPride

6   facilities are also parties to the [Master], and there is no risk that the Grievances will subject the

7   Employer to competing contractual claims lodged by different unions."] [emphasis in original].)

8          Aramark is similarly unsuccessful in attempting to distinguish the remaining three cases by

9   claiming that the Ninth Circuit's findings that the grievances were arbitrable in those cases were on the

10  basis that the relevant employees were not covered by separate CBAs. (Doc. 49-2 at 11 [citing *Dennis

11  L. Christensen Gen. Bldg. Contractor, Inc. v. Gen. Bldg. Contractor, Inc.*, 952 F.2d 1073 (9th Cir.

12  1991), *as amended on denial of reh'g* (Dec. 18, 1991); *Haig Berberian, Inc. v. Cannery

13  Warehousemen*, 535 F.2d 496 (9th Cir. 1976); *Int'l Bhd. of Elec. Workers, Loc. 1547, AFL-CIO v.

14  Alaska Commc'ns Sys. Holdings, Inc.*, 2021 WL 5276022 (9th Cir. Nov. 12, 2021)].) The Court finds

15  no indication that any of these decisions turned on the existence of a separate agreement, nor does

16  Aramark point to any.

17         At no point does Aramark assert that—or analyze whether—the particular grievances fall

18  within or without the scope of the Master's arbitration clause.[23] Aramark makes no reference to the

19  subject of the grievances or the language of the Master's arbitration clause in furthering its arguments.

20  It concentrates entirely on the AmeriPride CBAs. (*See, e.g.,* Doc. 49-1 at 21 [arguing the Master does

21  not give an arbitrator authority to interpret the *AmeriPride CBAs*]; *id.* at 22 [asserting that "evaluating

22  the impact and effect" of the *AmeriPride CBAs* "goes beyond the scope" of the Master]; Doc. 49-2 at 9

23  [claiming that the contractual obligations under the *AmeriPride CBAs* "establish that the parties'

24  dispute here is *not* covered by the [Master's] arbitration clause"].) Elsewhere, Aramark argues that the

25

26  _____

    [23] Aramark momentarily appears to raise a proper scope argument when it asserts that the Master's arbitration

27  clause is "not susceptible to an interpretation that would cover the dispute in this case as to the [Master's]
    coverage." (Doc. 49-1 at 21.) However, based on Aramark's assertions before and after, this argument appears

28  to be that the dispute is outside the scope of the Master's arbitration clause because it requires examining the
    AmeriPride CBAs, which the arbitrator does not have authority to do. Again, this ignores the subject of the
    particular grievance and misinterprets the arbitrability inquiry.

grievances are not within the scope of the *AmeriPride CBAs*' arbitration provisions.[24]

Aramark argues that Teamsters "*assume* the existence of a duty-to-arbitrate," (Doc. 49-3 at 8, emphasis in original), that the grievances "*purport* to be based on Article 1 of the [Master]," (Doc. 49-1 at 20, emphasis added), and that "although [Teamsters] *seeks* arbitration under Article 7.03 of the [Master]," their claims involve employees who are not covered by the Master. (*Id.* at 19.) However, whether Teamsters' reliance on Article 1.01 is baseless remains to be determined by the arbitrator. *See Haig Berberian*, 535 F.2d at 499 ("The question is whether the claim itself purports to be based on an interpretation of the contract."); *see also American Mfg.*, 363 U.S. at 568 (courts "have no business weighing the merits of the grievance" or "considering whether there is equity in a particular claim" but are instead "confined to ascertaining whether the party seeking arbitration is making a claim which on its face is governed by the contract").

The Merits Question asks whether the Master applies to the relevant employees by way of Article 1.01, and in reaching this determination, it may be relevant to consider whether separate CBAs bear on the Master's applicability to those employees. In other words, the AmeriPride CBAs may "defeat" the *merits* of Teamsters' grievances, but that is undisputedly an issue reserved for arbitration. (*See* Doc. 49-2 at 9.) Aramark does not acknowledge this important distinction, despite it being raised by Teamsters. Rather, Aramark doubles down in its reply, making another bare assertion that "there is no merit" to Teamsters' argument that Aramark "is asking the Court to decide the merits of the grievances to conclude that they are not substantively arbitrable." (Doc. 49-3 at 7; Doc. 50-5 at 7.) The Court finds otherwise, which is illustrated by the fact that Aramark does not dispute that it agreed to be bound by the Master and its arbitration clause.

Teamsters, on the other hand, contend that their "grievances regarding the application of

---

[24] Well-established law clarifying the arbitrability framework make it clear that the Court's inquiry does not examine whether the grievances are within the scope of the arbitration clauses contained in the *AmeriPride CBAs*. Aramark's assertions to this effect are likewise rejected as they are entirely unsupported by legal analysis or authority. (*See, e.g.*, Doc. 49-1 at 19 [the arbitration agreements in the *AmeriPride CBAs* "do not give the arbitrator authority to address the parties' rights and obligations under [the Master]"]; *id.* at 20 ["The arbitration clauses in the [AmeriPride] CBAs clearly and unequivocally do not cover [Teamsters'] grievances."]; Doc. 1 at ¶ 5 [no substantive arbitrability obligation exists under *AmeriPride* CBAs]; *id.* at ¶¶ 113(c), 130, 146 [grievances are outside scope of the AmeriPride CBAs]; *id.* at ¶¶ 127, 143 [no duty to arbitrate unless the grievances arise under AmeriPride CBAs]; *id.* at ¶¶ 128, 144 [no duty to arbitrate because the grievances do not "arise under the grievance arbitration provisions" of the AmeriPride CBAs].)

1   Article 1.01 of the [Master] to the employees working at the former AmeriPride locations constitute[]

2   a matter pertaining to the proper application and interpretation of the [Master]." (Doc. 50-2 at 9; *see*

3   *also id.* at 10-11 ["The interpretation of Article 1.01 of the [Master] and its application to relevant

4   employees is clearly a dispute arising out of the [Master] and therefore, the presumption of

5   arbitrability must prevail."]; Doc. 50-5 at 7 ["The grievances were filed under the [Master] and clearly

6   make a claim that requires interpretation of the [Master]."].)

7          The Court agrees. Teamsters' grievances seek to have an arbitrator determine whether the

8   AmeriPride facilities constitute "new or additional depots, routes or plants" under Article 1.01 of the

9   Master, and therefore whether the terms of the Master must be applied to the employees at those

10   facilities. (*See* JSUF ##11-12; Doc. 1 ¶ 31 [Member Case]; Doc. 1-3 at 4 [Member Case].) The Master

11   contains no express provision excluding the subject of the grievances from arbitration, and Aramark

12   fails to offer forceful evidence sufficient to overcome the heavy presumption in favor of arbitrability.

13   *AT & T*, 475 U.S. at 650; *Howmet,* 466 F.2d at 1256. And although Aramark asserts that resolution of

14   the parties' dispute regarding *substantive arbitrability* does not turn on the interpretation of Article

15   1.01 of the Master (Doc. 49-1 at 22; Doc. 49-2 at 7), it does not challenge that resolution of the

16   *grievances* does. Accordingly, this is the end of the Court's inquiry. *See Howmet*, 466 F.2d at 1256

17   ("The district court's function in the process is essentially ended once it has found the collective

18   bargaining agreement susceptible of an interpretation which would cover the dispute ...."); *see also*

19   *Mirage,* 911 F.3d 588, 596 (9th Cir. 2018) ("[N]or does [the employer] argue that the Union's

20   grievance is non-arbitrable as outside the scope of the parties' arbitration agreement[.] … Because that

21   is the essence of the substantive arbitrability inquiry … [the employer] has effectively conceded that

22   the dispute is substantively arbitrable."). The presumption of arbitrability must prevail.

23          **B.    Unlawful objective under the NLRA**

24          Aramark also challenges arbitrability based on the argument that the grievances have an

25   "unlawful objective" under the National Labor Relations Act, 29 U.S.C. §§ 151 *et seq.* (Doc. 49-1 at

26   23.)[25] More precisely, Aramark asserts the grievances seek to merge separate bargaining units without

27

28   [25] "The NLRA, later modified by the [Labor Management Relations Act], 'marked a fundamental change in the
Nation's labor policies' by recognizing the right of labor to organize and exercise economic power." *Retail*

1    Aramark's consent and to unilaterally impose new employment terms and conditions on the

2    AmeriPride bargaining units, both in violation of the NLRA. (*See id.*) Teamsters contend that the

3    Court is not authorized to determine that by pursuing the grievances, Teamsters are "committing an

4    unfair labor practice in violation of the NLRA," because the National Labor Relations Board has

5    primary jurisdiction over such claims. (Doc. 50-5 at 8.) [26]

6                    1.      Primary jurisdiction

7            In the context of labor disputes, the primary jurisdiction doctrine recognizes the "congressional

8    intent to have matters of national labor policy decided in the first instance by the National Labor

9    Relations Board." *Glaziers & Glassworkers Loc. Union No. 767 v. Custom Auto Glass Distributors*,

10   689 F.2d 1339, 1342 (9th Cir. 1982). In *San Diego Building Trades Council, Millmen's Union, Loc.*

11   *2020 v. Garmon*, 359 U.S. 236 (1959), the Supreme Court held that the doctrine preempted courts

12   from "independently deciding questions of national labor policy" and "emphasized that unfair labor

13   practices should be left in the first instance to the NLRB." *Glaziers*, 689 F.2d at 1342 (citing *Garmon*,

14   359 U.S. at 244-45); *see also Garmon*, 359 U.S. at 245 ("When an activity is arguably subject to § 7 or

15   § 8 of the [NLRA], the States as well as the federal courts must defer to the exclusive competence of

16   the [NLRB].").

17           Because section 301 also vested jurisdiction in the district courts over violations of labor

18   contracts, the Supreme Court declined to apply the *Garmon* rule in suits brought in federal court under

19   this section, instead holding that "[t]he authority of the [NLRB] to deal with an unfair labor practice

20   which also violates a collective bargaining contract is not displaced by § 301, but it is not exclusive

21

22

---

23   *Prop. Tr. v. United Bhd. of Carpenters & Joiners of Am.*, 768 F.3d 938, 950 (9th Cir. 2014) (quoting *Sears,
     Roebuck & Co. v. San Diego Cnty. Dist. Council of Carpenters*, 436 U.S. 180, 190 (1978)). "It both permits and
24   prohibits certain conduct by employers and employees." *Id.* Section 7 of the NLRA protects employees' "right
     to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives
25   of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or
     other mutual aid or protection[.]" 29 U.S.C. § 157. "Section 8 bars unfair labor practices by employers and
     labor organizations and also makes it illegal 'for an employer to interfere with, restrain, or coerce employees in
26   the exercise of the rights guaranteed in section [7 of the NLRA].'" *Moreno v. UtiliQuest, LLC*, 29 F.4th 567,
     574 (9th Cir. 2022) (quoting 29 U.S.C. § 158(a)-(b)).

27   [26] Though generally consistent with Ninth Circuit and Supreme Court precedent, the rule advanced by
     Teamsters is oversimplified. *See Retail Prop. Tr. v. United Bhd. of Carpenters & Joiners of Am.*, 768 F.3d 938,
28   951 (9th Cir. 2014) ("*Garmon* preemption deals specifically with when a labor matter must be brought before
     the NLRB, a complicated doctrine known as primary jurisdiction.").

1  and does not destroy the jurisdiction of the courts in suits under § 301." *Smith v. Evening News Ass'n*,

2  371 U.S. 195, 197 (1962); *see also Cement Masons Health & Welfare Tr. Fund for N. California v.*

3  *Kirkwood-Bly, Inc.,* 520 F. Supp. 942, 944 (N.D. Cal. 1981), *aff'd sub nom.,* 692 F.2d 641 (9th Cir.

4  1982) ("[I]t is well-settled that the principle enunciated in *Garmon* does not operate to preempt a

5  court's jurisdiction over a section 301 … action for a breach of contract which is also an unfair labor

6  practice.").

7      The principle of "concurrent jurisdiction" was recognized in *United Ass'n of Journeymen &*

8  *Apprentices of Plumbing & Pipefitting Indus., Steamfitters & Refrigeration Union, Loc. 342, AFL-CIO*

9  *v. Valley Engineers*, 975 F.2d 611 (9th Cir. 1992), *as amended* (Oct. 16, 1992). This is the only

10  decision relied upon by Teamsters. (*See* Doc. 50-5 at 8.) To be clear, however, the relevant issue in

11  *Valley Engineers* was discrete: whether a court, upon becoming aware that a simultaneous

12  administrative proceeding "implicated a material aspect of the litigation before it," should stay the suit

13  or enjoin the parties from proceeding in the other forum, which requires courts "to determine which is

14  the more appropriate forum for resolving that aspect of the dispute." 975 F.2d at 613.

15      In this narrow context, the Ninth Circuit recognized the blurry jurisdictional line between

16  representational and contractual issues in section 301 cases, holding that the NLRB has primary

17  jurisdiction over the former and shares concurrent jurisdiction with federal courts over the latter. *See*

18  *id.* at 613-14. This requires a "close examination" to determine whether "the major issues to be

19  decided ... can be characterized as primarily representational or primarily contractual." *Id.* (quoting

20  *Bhd. of Teamsters, Loc. No. 70 v. California Consolidators, Inc.*, 693 F.2d 81, 83 n.4 (9th Cir. 1982));

21  *see also id.* (noting the distinction courts have made "between those section 301 cases which turn on

22  our interpretation of the contract and those which, stripped to essentials, are representation cases")

23  (citing *Cappa v. Wiseman*, 659 F.2d 957, 958-59 (9th Cir. 1981)). And yet, Teamsters rely on *Valley*

24  *Engineers* without acknowledging this distinction or indicating their position on the nature of the

25  issues in this case.[27]

26

27  ───────────────────

28  [27] Aramark does not challenge Teamsters' assertion that resolution of its arguments would require the Court to make such a determination. However, Aramark does not address Teamsters' jurisdictional argument in any fashion.

1    Teamsters does not formally raise a preemption argument or challenge the Court's

2    "jurisdiction" over this action within the meaning of section 301. To be sure, the parties seek

3    adjudication of their claims filed in this Court, which, lest either party lose sight of the procedural

4    posture of this case, concern only whether the Court should compel arbitration. Neither party seeks

5    deference to the NLRB on this issue. Furthermore, the Court need not determine whether it has

6    jurisdiction over a question it has no occasion to answer. The issue before the Court is one of

7    substantive arbitrability, and as discussed *infra*, determination that a union's alleged conduct is—or is

8    not—unlawful under the NLRA is not part of that inquiry.

9                            2.    Lawfulness of the provision in dispute

10    As the first case cited by Aramark—and the only one on point—the Court finds a discussion of

11   *United Food & Commercial Workers Union v. Alpha Beta Co.*, 736 F.2d 1371 (9th Cir. 1984) is

12   warranted. There, the employer argued on appeal that enforcement of the disputed contract provision

13   would "infringe" on employee rights under the Labor Management Relations Act[28] and as such, the

14   provision was "unlawful and the district court erred in compelling arbitration of a dispute arising

15   under it." *Id.* at 1376. Citing the Supreme Court's decision in *Kaiser Steel Corporation v. Mullins*, 455

16   U.S. 72, 77, 83-84 (1982)[29], the Ninth Circuit recognized "that a court cannot compel arbitration if a

17   *contract clause* on its face violates federal labor law or is contrary to federal labor policy." *Id*.

18   (emphasis added).[30]

19    However, the Court distinguished its case from *Kaiser Steel* in a critical way when it held that

20   "a conflict between an arbitrator's decision and federal labor law is necessarily speculative when the

21

22

---

[28] The LMRA modified the NLRA by extending protection of employee rights under the NLRA from
interference by *labor organizations*, not only employers. Court in *Alpha Beta* noted that the LMRA was
originally enacted as section 7 of the NLRA. 29 U.S.C. § § 151 *et seq.*; 736 F.2d at 1376 (citing 29 U.S.C. §
157 (1976)); *see also Retail Prop.*, 768 F.3d at 950 (the LMRA "later modified" the NLRA).

[29] Acknowledging the primary jurisdiction doctrine set forth in *Garmon*, discussed *supra*, the Supreme Court
emphasized another "well established" rule to be considered: "a federal court has a duty to determine whether a
contract violates federal law before enforcing it." *Kaiser Steel*, 455 U.S. at 83.

[30] The Court also cited *W.R. Grace & Co. v. Local Union 759, International Union of United Rubber, Cork,
Linoleum & Plastic Workers of America*, 461 U.S. 757, 103 S. Ct. 2177, 2183-86 (1983), which recognized that
collective bargaining agreements, like all other contracts, may not be enforced if they are contrary to public
policy. *See Alpha Beta*, 736 F.2d at 1376. Aramark does not raise public policy as grounds to preclude
arbitration.

arbitrator has yet to rule. Such conflicts can be resolved when they become manifest in an action to enforce the award. The mere possibility of conflict, however, is no barrier to arbitration." *Alpha Beta*, 736 F.2d at 1376 (internal citations, quotation marks omitted). From an appeal of the district court's grant of a petition to compel arbitration, the employer in *Alpha Beta* was not challenging an arbitrator's decision or the court's enforcement of a disputed contract provision. *Cf. Kaiser Steel,* 455 U.S. at 78 (employer argued "that to require it to make contributions" under the disputed provision "would be to enforce a bargain that violates two different federal statutes," one of them being the NLRA).

For this reason, the *Alpha Beta* Court found no merit in the employer's speculations that "by seeking to enforce the disputed provision the Local Unions [were] attempting to unlawfully represent the employees," in violation of the NLRA. *Alpha Beta*, 736 F.2d at 1376. Thus, the Court held that it "need only decide whether an arbitrator could interpret the disputed contract clause in a manner that would render it lawful. Only if all possible interpretations of the contract provision would result in a conflict between that provision and [the NLRA] would arbitration be precluded." *Alpha Beta*, 736 F.2d at 1377.

### a.    *Legal standard under* Alpha Beta

Relying on *Alpha Beta*, Aramark argues that the grievances are not arbitrable because "it is not possible to interpret the [Master], including Article 1, in a way that would avoid conflicting with the NLRA." (Doc. 49-1 at 23.) According to Aramark, *Alpha Beta* stands for the proposition that "a dispute is non-arbitrable where there is no possible resolution that would be consistent with federal law." (Doc. 49-1 at 23.) It quotes the Court's actual holding, which is at odds with Aramark's theory. (*See id*. ["[I]f all possible interpretations of the contract provision would result in a conflict between that provision and [the NLRA] . . . arbitration [would] be precluded."].) Considering that Aramark recognizes the correct standard, it is troubling that it does not acknowledge or attempt to resolve this conflict.[31]

---

[31] Elsewhere, Aramark asserts that "[a] contract clause that would permit an arbitrator to determine the issue of merger without both parties' consent conflicts with the NLRA, and therefore arbitration of a dispute involving such a contract provision is precluded." (Doc. 49-1 at 23-24.) However, Aramark not only fails to clarify which contract clause it is referring to, it makes this conclusory assertion in reliance on the same unsupported

22

1    Aramark makes only one reference to "the contract provision in dispute." (*See* Doc. 49-1 at 23

2    [mentioning Article 1].) Otherwise, it consistently misidentifies the subject of the inquiry by focusing

3    on the grievances, arbitration demands, and the arbitration itself. (*See, e.g.*, *id.* ["The grievances seek

4    an outcome that is unlawful under the NLRA and are non-arbitrable for this reason as well."]; *id.*

5    [asserting that grievances have "unlawful or 'illegal objective[s]'" and thus, Teamsters' "arbitration

6    demand itself conflicts with the NLRA"]; *id.* at 24 [arguing that grievances "constitute an unlawful

7    demand to merge separate and distinct units that an arbitrator has no power to determine"]; *id.* at 27

8    [asserting that arbitration demand seeks to merge separate bargaining units, which indicates that "they

9    have an objective that is illegal under federal law and cannot be enforced."]; *id.* at 28 [arguing that

10   grievances and arbitration demands conflict with the NLRA]; *id.* [asserting that grievances seek to

11   "unilaterally apply, through arbitration, the terms" of the [Master] in violation of the NLRA, and thus,

12   "*arbitration* of [Teamsters'] grievances would conflict with the NLRA"] [emphasis added].)

13   Even assuming Aramark challenges the lawfulness of Article 1, it abandons any notion of a

14   "conflict" as quickly as it is raised. Aramark wholly omits from its discussion how Article 1 violates

15   the NLRA and does not appear to assert that the mere existence of a valid after-acquired clause is

16   sufficient to violate the NLRA. It suggests otherwise when it maintains that it is *not* "contending that a

17   collectively-bargained 'after-acquired clause' can never lawfully make a labor contract applicable to a

18   'new group of employees.'" (*See* Doc. 49-3 at 13.)

19                    *b.    Analysis*

20   Aramark puts forth an equally flawed analysis. By misstating the proper standard, Aramark

21   proceeds under three misconceptions: (1) that in determining arbitrability, the Court is authorized and

22   required to decide whether Teamsters' pursuit of the grievances violates the NLRA; (2) that this

23   remains true even when the arbitrator has yet to rule; and (3) that the presence of an after-acquired

24   clause, as the contract provision in dispute, is immaterial to the discussion.

25   Aramark proceeds on these assumptions by relying on "longstanding NLRB precedent" to

26

27   assumptions, discussed below. More importantly, Aramark does not offer any argument or cite to any
     applicable authority to support its assertion. Therefore, the Court considers this argument waived. *See Cal. Pac.*
28   *Bank v. FDIC*, 885 F.3d 560, 570 (9th Cir. 2018) ("[A]rguments are waived where the [party] does not present
     any argument to support its assertions and cites no authority.") (citation omitted).

demonstrate that the grievances have an unlawful objective under the NLRA, rather than discussing

arbitrability or the lawfulness of Article 1. (*See* Doc. 49-1 at 23-26.) However, none of the cited cases

involved an after-acquired clause, and several did not concern the subject of arbitration at all. *See, e.g.,*

*Frito-Lay, Inc. v. Loc. Union No. 137, International Brotherhood. of Teamsters, Chauffeurs,*

*Warehousemen & Helpers of America*, 623 F.2d 1354 (9th Cir. 1980); *N.L.R.B. v. Warehousemen's*

*Union Loc. 17, Int'l Longshoremen's & Warehousemen's Union*, 182 NLRB 781 (1970), *enforced*,

451 F.2d 1240 (9th Cir. 1971). Most of the decisions involve an NLRB determination,[32] appellate

review of an NLRB determination,[33] or both.[34] This case involves neither.

Turning, then, to the *Alpha Beta* framework, there is little left to discuss. The arbitrator has yet

to rule in this case, and as such, Aramark must prove that all possible interpretations of Article 1 are

unlawful to preclude arbitration. *Alpha Beta*, 736 F.2d at 1377; *see also United Food & Com. Workers*

*Union, Loc. 135 v. Ralphs Grocery Co.*, 2019 WL 8221085, at *3 (C.D. Cal. Oct. 9, 2019) (placing

burden on challenging party). The conclusory assertion that "it is not possible to interpret the [Master],

including Article 1, in a way that would avoid conflicting with the NLRA," (Doc. 49-1 at 23) is

insufficient to meet this burden. Aramark does not identify the employee rights or obligations that

would be violated by enforcing Article 1, much less explain "how or in what manner those rights

would be affected." *See Alpha Beta*, 736 F.2d at 1378 (finding that although the employer properly

asserted the disputed provision would interfere with the employees' self-organization right, it failed to

provide its reasoning).

It is possible that an arbitrator could interpret Article 1.01 in a manner that would render it

---

[32] *See Chicago Truck Drivers (Signal Delivery)*, 279 NLRB 904 (1986); *Local 32B-32J, Service Employees (Allied Maintenance)*, 258 NLRB 430 (1981); *Utility Workers Local 111 (Ohio Power)*, 203 NLRB 230 (1973); *Loc. Union No. 323*, 242 NLRB 305 (1979); *Teamsters Loc. 917* (Indus. City), 307 NLRB 1419 (1992); *Teamsters Loc. 70 (Emery Worldwide)*, 295 NLRB 1123 (1989); *Plumbers, Loc. Union No. 420,* 254 NLRB 445 (1981); *Commercial Workers, Loc. 1439*, 262 NLRB 309 (1982).

[33] *See Emery Worldwide, A.C.F. Co. v. N.L.R.B.*, 966 F.2d 1003 (5th Cir. 1992); *International Longshoremen's Association v. N.L.R.B.*, 277 F.2d 681 (D.C. Cir. 1960).

[34] *See Don Lee Distributor, Inc.*, 322 NLRB 470 (1996), *enforced,* 145 F.3d 834 (6th Cir. 1998); *AFL-CIO Joint Negotiating Committee (Phelps Dodge Corp.)*, 184 NLRB 976 (1970), *enforcement denied,* 470 F.2d 722 (3d Cir. 1972); *Warehousemen's* 182 NLRB 781 (1970); *Graphic Arts Int'l Union, Local 280*, 235 NLRB 1084 (1978), *enforced,* 596 F.2d 904 (9th Cir. 1979); *Elec. Workers IBEW Local 3 (Burroughs Corp.)*, 281 NLRB 1099 (1986), *enforced,* 828 F.2d 936 (2d Cir. 1987); *Commc'ns Workers (C & P Tel.)*, 280 NLRB 78 (1986), *enforced,* 818 F.2d 29 (4th Cir. 1987).

lawful. The arbitrator could interpret "new or additional depots, routes or plants" to include newly

established Aramark facilities resulting from an acquisition, notwithstanding the fact that the acquired

company's employees comprised separate bargaining units prior to acquisition, provided that the

acquisition succeeded the parties' execution of a valid collective bargaining agreement. Therefore,

"[h]aving determined that the disputed provision is susceptible to a lawful interpretation, [the Court]

must leave it to the arbitrator to decide on its proper construction." *Alpha Beta*, 736 F.2d at 1380.[35]

Aramark fails to demonstrate arbitration should be precluded on these grounds.

### C.   Alternative arguments

#### 1.   Consolidated arbitration

Aramark's final argument in the context of arbitration is that even if the grievances are deemed

arbitrable, the Court should find that Aramark is not obligated "to arbitrate separate grievances

involving separate facilities, filed at different times, in a single proceeding before a single arbitrator."

(Doc. 49-1 at 32.) Teamsters contends that the Court need not resolve this issue because "whether to

consolidate multiple grievances into a single arbitration is a procedural matter for an arbitrator to

decide," rather than a question of substantive arbitrability for the Court. (Doc. 50-5 at 15.)

Once a court determines "that the parties are obligated to submit the subject matter of a dispute

to arbitration, 'procedural' questions which grow out of the dispute and bear on its final disposition

should be left to the arbitrator." *John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543, 557 (1964); *see

also Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84 (2002) (explaining that procedural

questions "are presumptively *not* for the judge, but for an arbitrator, to decide") (citing *John Wiley*,

376 U.S. at 557). To support the opposite conclusion, Aramark relies on *United Food & Commercial

Workers, Local 21 v. MultiCare Health System*, 2011 WL 834141, at *3 (W.D. Wash. Mar. 3, 2011).

---

[35] Despite recognizing it is a party to the Master and bound by its terms (including the after-acquired clause at Article 1), Aramark argues that it never consented to *arbitrate* the issue of merger. (Doc. 49-1 at 26.) It offers the fact that the parties negotiated, entered into, and extended the AmeriPride CBAs as evidence that the parties consented to bargain separately as to the AmeriPride employees. (*Id*. at 26-27.) As discussed at length *supra*, III.A, there must be an express provision excluding this issue or forceful evidence of a purpose to exclude the issue from arbitration. Aramark fails to address the fact that the parties negotiated an after-acquired clause as part of their collective bargaining and must do so to demonstrate a purpose to exclude such a claim from arbitration. It also fails to examine the plain language of Article 1 or Article 7. The Court finds no express provision excluding this, or any, issue from arbitration. For the same reasons discussed herein, the Court cannot conclude that the AmeriPride CBAs constitute forceful evidence sufficient to overcome the heavy presumption in favor of arbitrability. *Howmet*, 466 F.2d at 1252.

(Doc. 49-1 at 32.) However, as discussed below, the decision in *MultiCare* is neither binding nor persuasive, and thus, the Court respectfully declines to follow it. As a result, Aramark's arguments are not well taken.

*MultiCare* involved two disputes: "(1) whether the Court or an arbitrator should determine whether the grievance can be resolved in a single, consolidated arbitration, and (2) *if the Court decides the issue*, whether it can order consolidated arbitration." 2011 WL 834141, at *1 (emphasis added). After concluding that the issue of consolidation was properly before it under the first issue, it proceeded to the second issue, declining to order consolidated arbitration because the eight relevant CBAs did not "reflect an intent to conduct a single arbitration on behalf of all bargaining units," where many contained competing arbitration provisions, and none referred to consolidation of grievances. *MultiCare*, 2011 WL 834141, at *2. Importantly, this rationale hinged on the Supreme Court's decision in *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662 (2010), which the Court finds misplaced for a few reasons.

First, the court's holding in *MultiCare* relied on the Supreme Court's discussion of an entirely distinct issue in *Stolt-Nielsen*. There, the Court specifically declined to address the first issue identified in *MultiCare*—whether the court or arbitrator should decide the issue of consolidation—because the parties had already agreed to submit the issue to arbitration. *See Stolt-Nielsen*, 559 U.S. at 678, 680 (explaining it "need not revisit" the question of "which decision maker (court or arbitrator) should decide whether the contracts in question" permitted class arbitration, because the parties expressly assigned the issue to the arbitration panel). The Court's discussion centered on the "standard the *appropriate decision maker* should apply in determining whether a contract allows class arbitration." *Id*. at 678, 680-81 (emphasis added). In other words, *MultiCare* put the cart before the horse; a court may not apply a standard without first having the authority to do so. Thus, a court must determine who the "appropriate decision maker" is before discussing what standard is to be applied, and certainly prior to applying it. Proper sequence aside, the Court nonetheless struggles to comprehend how a discussion of the proper standard bears on the question of identifying the appropriate decision maker.

Second, the holding in *Stolt-Nielsen* was narrowly confined to class-action arbitration. *See* 559 U.S. at 663. The Supreme Court recognized that "[i]n certain contexts, it is appropriate to presume that

parties that enter into an arbitration agreement implicitly authorize the arbitrator to adopt such

procedures as are necessary to give effect to the parties' agreement." *Id.* at 684-85. However, in

contrast to these procedural questions "which grow out of the dispute" and are presumptively for the

arbitrator, *id.* at 685 (citing *Howsam*, 537 U.S. at 84), the Court explained:

> An implicit agreement to authorize *class-action arbitration*, however, is
> not a term that the arbitrator may infer solely from the fact of the parties'
> agreement to arbitrate. This is so because class-action arbitration changes
> the nature of arbitration to such a degree that it cannot be presumed the
> parties consented to it by simply agreeing to submit their disputes to an
> arbitrator.

*Id.* (emphasis added). The Court then considered "some of the fundamental changes brought about by

the shift from bilateral arbitration to class-action arbitration" and concluded that these differences "are

too great for arbitrators to presume … that the parties' mere silence on the issue of class-action

arbitration constitutes consent to resolve their disputes in class proceedings." *Id.* at 686-87. Curiously,

*MultiCare* relies on this holding without considering the differences that the Supreme Court

recognized in reaching its conclusion. *See id.* at 685-86. In the Court's view, reliance on this narrow

holding necessitates such consideration.

Finally, the *MultiCare* court briefly discussed whether the issue of consolidation is procedural,

noting that the Ninth Circuit has not addressed the issue and two other circuits have concluded that it

is. 2011 WL 834141, at *3. Nonetheless, it quickly disposed of both holdings in light of *Stolt-Nielsen*,

reliance on which the Court finds inapt.

Considering *Stolt-Nielsen*'s emphasis on the unique concerns that arise in the context of class

actions, and the Court having no occasion to consider an application beyond that, the Court cannot

conclude that *Stolt-Nielsen* intended to extend its holding to consolidated arbitration in labor disputes.

Moreover, the Court does not conclude that the holding in *Stolt-Nielsen* bears on the "first question" at

all. Because that is the question facing the Court here—whether a court or an arbitrator is "the

appropriate decision maker," 559 U.S. at 678, the Court respectfully finds *Stolt-Nielsen* inapplicable

and *MultiCare* unpersuasive, and as a result, Aramark's reliance on these two cases unhelpful.[36]

---

[36] Aramark also cites the Ninth Circuit's decision in *Weyerhaeuser Co. v. W. Seas Shipping Co.*, which is
readily distinguishable; the Court was not tasked with determining who the appropriate decision maker is,

Turning back to the first question, though no published decision in the Ninth Circuit has directly addressed whether consolidated arbitration is an issue for the arbitrator under *Howsam*,[37] several other circuits have, which, collectively, the Court finds instructive. *See e.g., Shaw's Supermarkets, Inc. v. United Food & Com. Workers Union, Loc. 791, AFL-CIO*, 321 F.3d 251, 254 (1st Cir. 2003) (leaving the decision whether to consolidate three arbitration proceedings "in the hands of the arbitrator"); *Certain Underwriters at Lloyd's London v. Westchester Fire Ins. Co.*, 489 F.3d 580, 585 (3d Cir. 2007) ("Thus, 'only when there is a question regarding whether the parties should be arbitrating at all' is a question of arbitrability raised for the court to resolve. 'In other circumstances, resolution by the arbitrator remains the presumptive rule.'") (quoting *Dockser v. Schwartzberg*, 433 F.3d 421, 426 (4th Cir. 2006)); *Emps. Ins. Co. of Wausau v. Century Indem. Co.*, 443 F.3d 573, 577 (7th Cir. 2006) (rejecting argument that agreements made "no mention of consolidation," which indicated entitlement to separate arbitrations and instead finding that, under *Howsam*, "the question of whether an arbitration agreement forbids consolidated arbitration is a procedural one, which the arbitrator should resolve"); *Avon Prod., Inc. v. Int'l Union, United Auto Workers of Am., AFL-CIO, Loc. 710*, 386 F.2d 651, 658-59 (8th Cir. 1967) (holding that the "arbitrator must determine whether the grievances are to be resolved in a single or in multiple proceedings" and noting that "[t]he numerous decisions on this question by arbitrators adds substance" to the court's holding).

Guided by the above-cited authority and the facts of this case, the Court concludes no differently. Consolidated arbitration is the type of issue the parties did not expect the Court to decide but rather, a "procedural question which grow[s] out of the dispute and bear[s] on its final

---

which is the threshold inquiry here. *See* 743 F.2d 635, 637 (9th Cir. 1984) ("[T]he only issue properly before this Court is whether Weyerhaeuser, Karlander, and Trans-Pacific are parties to a written agreement providing for consolidated arbitration.").

[37] In an unpublished opinion, the Ninth Circuit held that consolidation was an issue for the arbitrator to decide. *See Certain Underwriters at Lloyds v. Cravens Dargan & Co.*, 197 F. App'x 645, 646 (9th Cir. 2006). Although not citable precedent, other district courts in this Circuit have considered *Cravens Dargen*, along with the overarching consensus on the issue in various other circuits, in concluding the same. *See, e.g., Emps. Ins. Co. of Wausau v. Hartford*, 2018 WL 6330425, at *4 (C.D. Cal. Dec. 3, 2018) (citing *Cravens Dargan* and "[a] majority of sister circuits" in concluding consolidation was a question for arbitrator); *Meadows v. Dickey's Barbecue Restaurants Inc.*, 2016 WL 7386138, at *2 (N.D. Cal. Dec. 21, 2016) (same); *Cohen v. CBR Sys., Inc.*, 2023 WL 8602288, at *2 (N.D. Cal. Dec. 12, 2023) (relying on *Meadows*); *A-1 A-Lectrician, Inc. v. Commonwealth Reit*, 943 F. Supp. 2d 1073, 1079-80 and n.4 (D. Haw. 2013) (collecting circuit cases and noting, but not relying upon, *Cravens Dargan*, because it was not citable precedent under Ninth Circuit Rule 36-3 and Federal Rule of Appellate Procedure 32.1).

1    disposition," and thus, one for the arbitrator. *Howsam*, 537 U.S. at 84 (quoting *John Wiley*, 376 U.S. at

2    557). Thus, the Court rejects Aramark's argument to the contrary.

3            2.      Estoppel

4            In the alternative, Aramark contends that under principles of estoppel, Teamsters should not be

5    permitted to bypass their obligations under the *AmeriPride CBAs* after accepting benefits under them.

6    (*See* Doc. 49-2 at 14-16; Doc. 49-3 at 11.)[38] Teamsters claims that this argument "relies primarily on a

7    line of cases that has nothing whatsoever to do with the facts here," and as a result, Aramark fails to

8    demonstrate that Teamsters "have engaged in any conduct that equitably estops them from pursuing"

9    their grievances under the Master. (Doc. 50-6 at 7-8.) The Court agrees.

10           Aramark cites various Ninth Circuit cases it claims have "applied equitable principles in

11   determining substantive arbitrability questions to find that a party is estopped from *challenging the*

12   *validity of an arbitration clause in a contract* where the party has accepted benefits *under the*

13   *contract*." (Doc. 49-2 at 14, emphasis added.) However, the substantive arbitrability question here

14   does not involve the AmeriPride CBAs; Teamsters do not challenge the validity of the AmeriPride

15   CBAs' arbitration clauses and neither party seeks arbitration under those CBAs.

16           Importantly, three of the cases cited by Aramark concern whether a nonsignatory refusing

17   arbitration can be bound by an arbitration agreement under the principle of equitable estoppel. *See*

18   *Comer v. Micor, Inc.*, 436 F.3d 1098 (9th Cir. 2006); *Peck Ormsby Const. Co. v. City of Rigby*, 526 F.

19   App'x 769 (9th Cir. 2013); *Loc. 640 Trustees of IBEW & Arizona Chapter NECA Health & Welfare*

20   *Tr. Fund v. CIGNA Health & Life Ins. Co.*, 2021 WL 3290534 (D. Ariz. Aug. 2, 2021), *aff'd sub nom.*

21   No. 21-16424, 2022 WL 2805111 (9th Cir. July 18, 2022). The error in relying on these cases is

22   twofold: it is undisputed that Teamsters are signatories to the parties' collective bargaining agreement,

23   and it hardly bears repeating that Teamsters is *seeking*, rather than refusing, arbitration.

24           Aramark also cites *Nghiem v. NEC Elec., Inc.*, 25 F.3d 1437 (9th Cir. 1994), which is equally

25   distinguishable. There, the appellant sought reversal of an arbitration award on the grounds that it did

26

27   _____

     [38] Aramark asserts that the same points made in support of its duty-to-arbitrate agreement also support its
28   estoppel argument, specifically that: (1) the parties continued to apply the separate CBAs after the acquisition;
     (2) the parties negotiated and agreed to contractual extensions of the AmeriPride CBAs, (3) by mutual
     agreement, the separate CBAs remain in effect. (*See* Doc. 49-3 at 10-11.)

1   not sign an agreement, the agreement was not in writing, and the arbitrator lacked authority to issue

2   the decision. *Id*. at 1439-40. The Ninth Circuit found there was an implied agreement to arbitrate

3   based on the appellant's conduct, which included *initiation of*, and participation in, arbitration

4   proceedings. *Id*. at 1440. None of the circumstances in *Nghiem* are present here.

5         In sum, Aramark does not explain how this line of cases supports the notion that *Aramark* has

6   no duty to arbitrate under the *Master* based on Teamsters' acceptance of benefits under *the*

7   *AmeriPride CBAs*. (*See, e.g.*, Doc. 49-2 at 14-15 [limiting reliance on *Comer* to the Court's definition

8   of equitable estoppel and providing no explanatory parenthetical in citing *Nghiem*].) Thus, this

9   argument fails. Because the remainder of Aramark's arguments flow from this unsupported assertion,

10   the Court finds them similarly unpersuasive. (*See id*. at 15-16.)

11              3.      Waiver

12         Aramark argues also that the "same facts" relied upon in asserting estoppel "warrant [a]

13   finding that [Teamsters] waived any right that might otherwise exist regarding a duty-to-arbitrate

14   under any contracts" other than the AmeriPride CBAs. (Doc. 49-3 at 10-11, emphasis omitted.)[39] It

15   argues only that "similar to" *Madrid v. Lazer Spot, Inc.*, 2020 WL 4274218 (E.D. Cal. July 24, 2020),

16   "the elements needed to prove waiver are present, which this Court also held was appropriate for the

17   Court, and not an arbitrator, to resolve …." (Doc. 49-3 at 11.) Teamsters argue that the issue of

18   whether the extensions constitute a waiver of their claims is for the arbitrator, as it goes to the merits

19   of the grievances. (*See* Doc. 50-5 at 12.)

20         First, contrary to Teamsters' assertion, this issue is properly before the Court. Although

21   Aramark may take the position that the extensions of the AmeriPride CBAs generally waive

22   Teamsters' claims, and although Aramark asserts a finding of waiver is warranted based on the fact

23   that the extensions "gave continuing force and effect to" various "mutual obligations and

24

25

---

26   [39] In opposition to Teamsters' motion for summary judgment, Aramark makes scant reference to waiver by way of a footnote. It claims that "estoppel precludes [Teamsters] from asserting that a duty-to-arbitrate exists under a
27   labor contract other than the [AmeriPride] CBAs," but emphasizes that it has "preserved [its] position" that Teamsters' actions on the date of acquisition and thereafter "also constituted a waiver and/or bar based on the doctrine of laches of any and all rights that otherwise existed under the [Master] and any other contracts other
28   than the [AmeriPride] CBAs." (Doc. 49-2 at 15 n.5, citing Doc. 1 at ¶ 113(e).) This is Aramark's only reference to the defense of laches with respect to the pending motions.

1    commitments," (*see* Doc. 49-3 at 10), Aramark specifically relies on the "waiver-by-litigation-

2    conduct" standard examined in *Madrid* in advancing its argument. (*See id.* at 11-12.) It is established

3    in the Ninth Circuit that waiver in this context is a gateway issue and thus, a question presumptively

4    for the Court to decide. *See Martin v. Yasuda*, 829 F.3d 1118, 1123 (9th Cir. 2016) (citing *Cox v.*

5    *Ocean View Hotel Corp.*, 533 F.3d 1114, 1121 (9th Cir. 2008)). Other circuits have reached the same

6    conclusion. *See Martin*, 829 F.3d at 1123 (collecting cases from the First, Third, Sixth, and Eleventh

7    Circuits).

8           Turning then to Aramark's argument, "the test for waiver of the right to compel arbitration

9    consists of two elements: (1) knowledge of an existing right to compel arbitration; and (2) intentional

10   acts inconsistent with that existing right." *Hill v. Xerox Bus. Servs., LLC*, 59 F.4th 457, 468 (9th Cir.

11   2023).[40] As to the first element, Aramark contends Teamsters "clearly had 'knowledge' that Aramark

12   acquired AmeriPride in January 2018, and also had knowledge of the [Master] (including the

13   arbitration provisions that [Teamsters] now seek to invoke)." (Doc. 49-3 at 11.) Aramark is careful not

14   to assert that Teamsters knew of its right to compel arbitration under the Master, being that such an

15   assertion would directly conflict with Aramark's overall position. Nonetheless, it is undisputed

16   Teamsters had knowledge of the right to compel arbitration, and thus, this requirement is satisfied.

17          Next, in determining whether a party took acts inconsistent with a right to arbitration, courts

18   "consider the totality of the parties' actions" by asking "whether those actions holistically 'indicate a

19   conscious decision … to seek judicial judgment on the merits of the arbitrable claims, which would be

20   inconsistent with a right to arbitrate.'" *Armstrong v. Michaels Stores, Inc.*, 59 F.4th 1011, 1015 (9th

21   Cir. 2023) (quoting *Hill*, 59 F.4th at 473 n.19). Under this precedent, "[a] party generally 'acts

22   inconsistently with exercising the right to arbitrate when it (1) makes an intentional decision not to

23   move to compel arbitration and (2) actively litigates the merits of a case for a prolonged period of time

24   in order to take advantage of being in court.'" *Fox v. Experian Info. Sols., Inc.*, --- F. Supp. 3d ----, ----

25

26   ───────────────

27   [40] To clarify, until recently, the party opposing arbitration was required to demonstrate a third element: "prejudice to the party opposing arbitration resulting from such inconsistent acts." *Madrid*, 2020 WL 4274218, at *6 (quoting *Fisher v. A.G. Becker Paribas Inc.*, 791 F.2d 691, 694 (9th Cir. 1986)). However, the Supreme Court's decision in *Morgan v. Sundance, Inc.*, 596 U.S. 411 (2022) "eliminated the prejudice requirement as an element from any arbitration waiver test." *Hill*, 59 F.4th at 468. In any event, although Aramark briefly addresses the prejudice it has suffered, the Court need not reach this inquiry.

28

1   , 2024 WL 755804, at *4 (E.D. Cal. Feb. 23, 2024) (quoting *Armstrong*, 59 F.4th at 1015).

2       Aramark argues that Teamsters "took actions 'inconsistent' with any duty to arbitrate (or apply

3 other provisions) of the [Master] to the Merced and Bakersfield facilities." (Doc. 49-3 at 11.)

4 However, Aramark does not—and cannot—argue that Teamsters sought judicial judgment on the

5 merits of their grievances, that Teamsters made an intentional decision not to move to compel

6 arbitration, or that Teamsters actively litigated the case's merits for any amount of time. To the

7 contrary, Teamsters only pursued litigation in this case after Aramark refused to submit to arbitration,

8 despite Teamsters' adamance that the arbitrator, and not the Court, is charged with resolving the

9 merits of their claims. (*See* Doc. 1 at 2 ¶ 1; Doc. 50-2 at 9.) Therefore, Aramark fails to demonstrate

10 that Teamsters waived their right to arbitration or are estopped from asserting that right.

11 **IV.    Attorney's Fees**

12       As a final matter, Teamsters seek an award of attorney's fees and expenses incurred during

13 these proceedings on the ground that Aramark's refusal to arbitrate was frivolous and in bad faith. (*See*

14 Doc. 50-2 at 11-12.) Aramark opposes this request. (Doc. 49-2 at 17.)

15       "Under federal law, attorney's fees are available in a § 301 case when 'a party frivolously or in

16 bad faith refuses to submit a dispute to arbitration or appeals from an order compelling arbitration.'"

17 *Constr. & Gen. Laborers' Loc. 185 v. Seven-Up Bottling Co. of San Francisco*, 2010 WL 5136200, at

18 *8 (E.D. Cal. Dec. 10, 2010) (quoting *Alpha Beta,* 736 F.2d at 1383); *see also Int'l Union of*

19 *Petroleum & Indus. Workers v. W. Indus. Maint., Inc.*, 707 F.2d 425, 428 (9th Cir. 1983) (explaining

20 that "[t]hese considerations are particularly apt in the context of labor arbitration" because "[e]ngaging

21 in frivolous dilatory tactics not only denies the individual prompt redress, it threatens the goal of

22 industrial peace").

23       Bearing in mind federal policy favors arbitration, the Ninth Circuit has applied "a less

24 demanding—'without justification'—standard in cases involving refusals to arbitrate." *United Fed'n*

25 *of Agents & Int'l Representatives v. United Food & Com. Workers Union, Loc. 101*, 8 F. App'x 737,

26 740 (9th Cir. 2001) (quoting *Alpha Beta*, 736 F.2d at 1382-83). Evidence of dilatory tactics and

27 inconsistent positions has supported a bad faith finding. *See Fed'n of Agents*, 8 F. App'x at 740-41

28 (district court did not abuse its discretion in finding union resisted arbitration in bad faith and "without

justification" where it relied on "evidence of delay tactics and inconsistent positions taken by" the union).

Teamsters lends insufficient support for the argument that Aramark's filing of a declaratory judgment action, despite withdrawing its NLRB charge, is sufficient to satisfy this standard. In fact, the Court finds this conduct enlightening. Although Aramark's arguments are unavailing, it filed its NLRB charge based on the position that, *inter alia*, Teamsters' attempt to arbitrate was an unfair labor practice in violation of the NLRA. (*See* JSUF # 15; Doc. 31 at 334.) Aramark then pursued litigation for the purpose of clarifying the parties' rights and obligations, based on its consistent position that it had no duty to arbitrate the grievances. Although Teamsters is not wrong to claim it was Aramark's refusal to arbitrate that necessitated filing the instant petition to compel arbitration, the Court does not identify any dilatory tactics on Aramark's behalf, nor does Teamsters assert that Aramark engaged in such tactics.[41] It was Aramark that first initiated these section 301 proceedings to determine whether it must submit to arbitration. The parties then entered into—and extended—an agreement tolling the deadline for Teamsters to file a petition to compel arbitration. (JSUF # 16.)

Given the facts of this case as well as the relatively nuanced nature of the issues presented, the Court finds that Aramark's refusal to arbitrate was perhaps misguided, but not without justification. *Cf. Seven-Up*, 2010 WL 5136200, at *8 (finding refusal to arbitrate was "without justification" where employer's duty to arbitrate was "straightforward" and it had "not asserted a single justification for its refusal to arbitrate other than procedural issues which are themselves subject to arbitration"). Thus, Teamsters' request for attorney's fees is **DENIED**.

## V.     Conclusion and Order

Based upon the foregoing, the Court **ORDERS**:

1.     Lead Case Plaintiff's motion for summary judgment (Doc. 32) is **DENIED**.

2.     Lead Case Defendants' motion for summary judgment (Doc. 29) is **GRANTED**.

---

[41] With that said, it is worth emphasizing the unnecessary burden placed on the Court when the accuracy of counsel's citations to legal authority—whether in form or function—is put into doubt. This burden is worsened by counsel's "spaghetti approach," which requires the Court to spend time articulating and addressing inconsistent and/or immaterial arguments. Though the Court appreciates the considerable delay caused by the extensive civil backlog in this District, surely this waste of judicial resources is not conducive to "prompt redress" (*Int'l Union of Petroleum*, 707 F.2d at 428) and, in fact, it does the opposite.

3.     The parties **SHALL** submit to arbitration of the relevant grievances pursuant to the Master's grievance procedures.

4.     Lead Case Defendants' request for attorney's fees (Doc. 29-1 at 11-12) is **DENIED**.

5.     The Clerk of Court is directed to enter judgment in favor of Lead Case Defendants and **CLOSE** this case.

///

6.     Member Case No. 1:21-cv-01102-JLT-EPG shall remain closed.

IT IS SO ORDERED.

Dated:     **September 6, 2024**

UNITED STATES DISTRICT JUDGE

34